Page 1

<pre>
 1              UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3

 4

 5   IN RE:                      CASE NO. 17-16113-BKC-RAM
                                 CHAPTER 15
 6   MMX SUDESTE MINERACAO S.A.,

 7            Debtor.
     _____/
 8

 9

10

11                     ECF# 19, 20

12

13                   November 1, 2017

14

15            The above-entitled cause came on for hearing

16   before the Honorable ROBERT A. MARK, one of  the Judges in

17   the  UNITED  STATES  BANKRUPTCY  COURT,  in  and  for  the

18   SOUTHERN  DISTRICT OF  FLORIDA, at 301 North Miami Avenue,

19   Miami,  Miami-Dade County,  Florida, on  November 1, 2017,

20   commencing  at  or  about  2:04 p.m.,  and  the  following

21   proceedings were had:

22

23        Transcribed from a Digital Audio Recording by:
                  Margaret Franzen, Court Reporter
24

25
</pre>

1          APPEARANCES:
2
3

4                  SEQUOR LAW, by
              GREGORY GROSSMAN, ESQUIRE
          ANNETTE C. ESCOBAR, ATTORNEY-AT-LAW
5              JUAN MENDOZA, ESQUIRE
               And Brazilian Counsel
6      ENRIQUE RODRIGUEZ FORSSELL, ESQUIRE
               FELIPE VIEIRA, ESQUIRE
7       On behalf of the Foreign Representative,
                Bernardo Bicalho
8
9

10                 BAST AMRON, by
               JEFFREY BAST, ESQUIRE
11            ZAKARIJ N. LAUX, ESQUIRE
       On behalf of Minerao e Metalicos, et al.
12
13
14            ALSO PRESENT:
15

      BERNARDO BICALHO, Foreign Representative
16    CORINNE AFTIMOS, Judge Mark's Law Clerk
      ECRO - Electronic Court Reporting Operator
17
18             - - - - - - - -
19
20
21
22
23
24
25

1          THE COURT:  You're outnumbered.  Have a

2    seat.  Thanks.

3          All right.  Let's get the appearances first

4    of the foreign representative.

5          MR. GROSSMAN:  Good afternoon, Your Honor.

6          I am Greg Grossman of Sequor Law, along with

7    my colleagues at Sequor Law, Annette Escobar -- I'm

8    Grossman, G-r-o-s-s-m-a-n, Escobar, E-s-c-o-b-a-r, and

9    Juan Mendoza, M-e-n-d-o-z-a.

10          In the peanut gallery is ---

11          THE COURT:  Hold on one second.

12          MR. GROSSMAN:  Sure.

13          THE COURT:  I left my pad --

14          THE LAW CLERK:  Okay.

15          THE COURT:  -- I think it's next to my

16    computer.

17          Go ahead.

18          MR. GROSSMAN:  In the -- in the gallery is

19    the foreign representative, Bernardo Bicalho, which is

20    B-i-c-a-l-h-o, and his Brazilian lawyers, Enrique

21    Forssell, F-o-r-s-s-e-l-l, and Felipe Vieira, V-i-e-i-r-a.

22          THE COURT:  Okay.

23          MR. LAUX:  Good afternoon, Judge.

24          Zakarij Laux, L-a-u-x, with BastAmron here

25    with my colleague, Jeffrey Bast, B-a-s-t, and we represent

1    interested party MMX Minerao e Metalicos, S.A.  We also

2    represent 22 interested parties, which for brevity's sake,

3    I will not name today on the record, but they are

4    reflected in the notice of joinder that's at Docket

5    Entry 22.

6                   THE COURT:  I didn't go back to the actual

7    notice, but I think as described in Mr. Grossman's

8    response, Mercato Botafogo was not one of the parties

9    joining, even though they are a target?

10                  MR. LAUX:  That's correct, Judge.

11                  THE COURT:  Okay, and then just to clarify,

12   I don't know how to pronounce E-i-k-e.  Do you know how to

13   pro ---

14                  MR. LAUX:  I -- I've been saying Eike,

15   Judge, but I'm not positive.

16                  THE COURT:  Okay.  So Eike Batista joined,

17   but when I looked at at least one of the subpoenas, I

18   didn't see -- is it a he, a she, or a corporation?

19                  MR. LAUX:  It's a he.

20                  THE COURT:  A he.

21                  MR. LAUX:  It's a he, Judge.

22                  THE COURT:  I didn't see him listed as one

23   of the related parties, who I'll call the targets of the

24   subpoenas.  So ---

25                  MR. LAUX:  That's correct, Judge, I have --

1    I believe all of the subpoenas are the same.  I'm looking

2    at the one at Docket Entry 16, and it does not appear that

3    he is a related party.

4                    THE COURT:  Mr. Grossman, is he in some of

5    the subpoenas?

6                    MR. GROSSMAN:  Your Honor, yes, in the -- in

7    the subpoena to The Clearing House --

8                    THE COURT:  Okay.

9                    MR. GROSSMAN:  -- is a different list.

10                   THE COURT:  Okay.

11                   MR. GROSSMAN:  So he's listed in the -- in

12   The Clearing House one.

13                   THE COURT:  All right.  So that -- that

14   makes sense.

15                   Okay.  So without taking further argument,

16   I'm going to deny the motion to dismiss.

17                   I've -- I've never written on it, but I've

18   certainly read both the opinion and some of the

19   commentary.  I hadn't read Glassbon's -- Glossban's

20   (phonetic) article, but I -- I reject the holding of the

21   2nd Circuit in Drawbridge Special Opportunities Fund vs.

22   Barnet, In Re:  Barnet, 737 F.3d 238, 2nd Circuit, 2013,

23   and agree with the majority view of commentators and

24   courts that find that 109 does not apply to a Chapter 15.

25                   If by some chance the -- another case comes

1  up through the circuit, and the 11th Circuit agrees with

2  Barnet, I would alternatively find that the bank deposit

3  by the foreign representative, even if advanced by the

4  foreign representative, would satisfy the jurisdictional

5  requirement, and I think that ruling, Mr. Grossman, moots

6  out any arguments about standing; right?

7            The standing arguments were on the motion to

8  dismiss?

9            MR. GROSSMAN:  Yes, sir.

10           THE COURT:  Okay.  All right.  So sort of

11  interesting in reading the papers, and I've got like four

12  different cases going, I actually had one yesterday with a

13  discovery dispute.

14           I was surprised, and I don't take it

15  personally, but I was surprised because it deals with

16  discovery in Chapter 15s, that there wasn't any discussion

17  of Petroforte.

18           Have you -- are you familiar with that case?

19           MR. LAUX:  I -- I am familiar with it,

20  Judge, yes.

21           THE COURT:  Okay.  You did make the argument

22  that putting aside confidentiality and trade secrets, that

23  the subpoenas should be limited anyway for -- for many of

24  the entities, but are you -- what's your view on whether

25  the limits in Petroforte should be applied?

1          MR. LAUX:  As -- as far I as understand,

2     Judge, the -- the trustee hasn't, in this case, made any

3     type of initial showing that the related entities, as

4     described in the subpoenas, at least the 15 that aren't

5     mentioned in the veil piercing order, that there -- that

6     there's any basis for discovery with respect to their

7     financial records, and the vast swath of documents that

8     the subpoenas actually request, which goes beyond mere

9     financial papers, account statements, cancelled checks,

10    but actually requests all correspondence related to these

11    entities and their accounts, liens, mortgages, et cetera.

12          THE COURT:  All right.  Well, the limits --

13    the limits in Petroforte, and I -- I applied those in

14    another 15 I have, a case called Massa Falida de Mappin,

15    and the ruling was actually in an adversary proceeding

16    because it -- proceeding that was started in order to

17    freeze certain assets of parties subject of veil piercing

18    orders in Brazil.

19          But in that case, as well -- and the

20    adversary, the cite, if you want to look at it later, is

21    16-1626, Docket Entry 81, which was the order granting in

22    part and denying in part a motion for protective order.

23    But the gist of it coming out of Petroforte or the second

24    Petroforte opinion, it's 542 B.R. 899, 2015, is that if

25    there's any entities that are either debtors, and in this

1   case I guess to -- to me, we'll get into that in a minute,

2   would include the three individuals or entities subject of

3   the veil piercing, broad discovery could be taken as to

4   those, and in Petroforte, I said broad discovery, as well,

5   could be taken as to any target that the trustee could

6   show is owned or controlled by one of the debtors.

7            But otherwise, as to other targets, which

8   would include most of your clients, the discovery would be

9   limited to transactions or transfers between the targets

10  and any one of the debtors or any bank documents,

11  signature cards or otherwise that would show ownership

12  interest of any of the debtors.

13           So Petroforte itself would -- would greatly

14  limit the discovery, but you raise a -- a point and -- and

15  let me shift gears to Mr. Grossman or Ms. Escobar for --

16  for a minute because Mr. Grossman and Ms. Escobar are

17  involved in Petroforte.

18           There -- there we did know that there was

19  some connection between the targets.  So what is the basis

20  for the list of, I'm calling them targets, in the

21  subpoenas?

22           Can you just ---

23           MR. GROSSMAN:  Thank you, Judge.

24           Greg Grossman for the foreign

25  representative.

1          In -- in preparation for the hearing, and

2    taking into account Petroforte, I will concede this record

3    is a bad record for us to be able to do that.  We didn't

4    do a good job of giving you the backup that we have or

5    that we should have given you, and it's -- my apologies to

6    the Court for that.

7          In the consultation with my client, part of

8    it is the -- the notion of saying, and I -- the analogy

9    that I had thinking it through is that if I wrote a

10   subpoena that had the name Berkshire Hathaway and had ten

11   other names after the name Berkshire Hathaway, we would

12   all pull up Warren Buffett's face in our mind.

13         These entities are all Batista entities,

14   Eike Batista entities, but we don't have that record to

15   show you, and that's not fair to the Court.

16         So from the perspective of the Court saying

17   the Petroforte decision should apply -- and I understand

18   the twist here because in Petroforte they were made

19   debtors, whereas here they are targets of a -- of a veil

20   piercing.

21         We are prepared right from the get go to say

22   that Petroforte with that twist, that here since they're

23   not debtors, but they are targets, would be appropriate,

24   and with respect to the other targets I would request --

25   we can do it two ways.

1              With respect to the rest of these targets,

2    what I would be concerned about is if you grant the motion

3    for -- to quash them, and then I come forward and I show

4    you the connection, because we have documentation why

5    these entities are -- are connected to the debtor or to

6    Mr. Batista or to the other two entities, but it's not of

7    record and that's not fair to the Court.

8              If you were to grant the -- the motion to

9    quash in that regard, then we would issue another

10   subpoena, they likely would object, we'd be right back

11   here again.

12             What I would propose, Judge, is rather than

13   have us spend a lot of nonsense time procedurally, is with

14   respect to those, if you could defer ruling, give us a

15   deadline, we will then come forward, show the Court the

16   connection, show the Court the proposed revised subpoena.

17             We can get a ruling on the front end so we

18   don't spend time, energy and effort, because it's -- if I

19   issue a subpoena, the BastAmron firm will get notice of

20   it, they'll object, we'll be right back here, and then the

21   subpoenaed targets will have a subpoena in their hands and

22   they won't know what to do with it.

23             So this way, we -- we -- instead of doing it

24   the way our local rule would be, where I issue the 2004,

25   come before the Court, show the connection, your Court

1    will rule, and then we can issue the subpoena out.

2                    So with respect to the -- the other targets,

3    I think -- I think you -- I'm going to take your word on

4    it, Zak, the 15 -- it's 15 of the 22 that are not

5    mentioned at all in the Brazilian Judge's ruling.  With

6    respect to those entities, I don't think we have a

7    sufficient record to -- to -- for you to ---

8                    THE COURT:  Well, is it -- is it your

9    proffer that -- how did you pronounce it, Eike,

10   Eike Batista?

11                   MR. GROSSMAN:  Eike Batista is the ---

12                   THE COURT:  Eike Batista owns a majority

13   interest or controls these entities so that you would, if

14   you make that showing, be entitled to broad discovery,

15   assume -- assuming I treat Batista equivalent to a party

16   over whom the bankruptcy has been extended, and actually,

17   we can argue that today, but that's what I did in Mappin.

18                   Mansour and his entities were the subject of

19   veil piercing, but it seems equivalent to me if their

20   assets are -- are subject to the debts of the -- of the

21   debtor, that they should be treated as debtors equivalent

22   to the parties to whom a bankruptcy is formally extended,

23   but we can -- we can talk about that.

24                   But going back to the question about your

25   proffer, do you think Batista -- you'd be able to show

1    Batista owns or controls, or that just has an interest in

2    so that -- I guess what I'm asking you is, do you think

3    you're going to be able to justify the broad discovery

4    under Petroforte or the narrower discovery, or you don't

5    know yet until you look more carefully?

6              MR. GROSSMAN:  There's a couple of things

7    going on.

8              With respect to some of the entities, there

9    is publicly available information that we can show the

10   Court that would justify in our hypothetical the broad

11   discovery.

12             There is also information that are public --

13   in the public domain that would give us the limited

14   portion that you've described.

15             There are some documents that are not

16   public, which is one of the things that we didn't do a

17   good job, that we -- we may have to go and ask permission

18   to look at or to get permission to -- to exhibit here, so

19   that we can satisfy the Court that we'd be entitled to

20   that broad discovery.

21             I don't want to prejudge it, I'm not -- you

22   know, I don't think it's fair to them, they haven't seen

23   anything that we've talked about here, but the answer

24   would be, Judge, I know the ruling in Mappin.

25   Mr. Forssell is the instructing counsel to that trustee.

1    We know the ruling there.

2              If we cannot find documentation sufficient

3    to justify even the limited, then I would advise the

4    BastAmron firm and we'll walk away from that request.

5              If we have enough to get the limited or if

6    there is a debate about the limited, we would come forward

7    and show that conversation, and if we have enough that we

8    think would justify the broad discovery, we will do that,

9    too.

10             THE COURT:  Is there an order, albeit one

11   that may be under seal or that you haven't -- whether

12   under seal or not, that you haven't put in the record,

13   that is specific to these listed entities in the subpoenas

14   or no?

15             MR. GROSSMAN:  I don't believe so, Judge.

16   In fact, a couple of these entities, their names are

17   subject to freeze orders of being Mr. Batista's companies

18   in litigation not brought by the trustee, but bought by

19   third parties with a court order.

20             THE COURT:  But not other bankruptcies?

21             MR. GROSSMAN:  Not out of the bankruptcy.

22             THE COURT:  Not other -- not bankruptcies of

23   the --

24             MR. GROSSMAN:  Correct.

25             THE COURT:  -- Batista entities?

1          MR. GROSSMAN:  Correct.  So we -- we're

2   aware there's lawsuits against Mr. Batista in which

3   they've -- other courts have said this entity is owned and

4   controlled by him, and that's at least one or two of these

5   on this -- on this list.

6          THE COURT:  Okay.

7          MR. GROSSMAN:  I mean, I -- I will say,

8   Judge, that in front of Judge Cristol we had a similar

9   chicken and egg issue about how much can you show in order

10  to justify the subpoena, and Judge Cristol didn't -- he

11  entered a specific separate order that said to the folks

12  who were filing a motion here, tell me your connection to

13  the debtor, if any.

14          And that cut through about three or four

15  different filings to find out that they were all insiders

16  under the Bankruptcy Code, if you took the definition of

17  insider.  He said, I want the movants who are before me to

18  tell me their connection to the debtor and whether or not

19  they are or are not insiders.

20          Now, insider is not necessarily this Court's

21  ruling in Petroforte.  Your Court -- your -- your ruling

22  was more about percentage control, et cetera, but that

23  was -- he didn't seem to have any problem doing that.

24          THE COURT:  Are you asking for that or -- or

25  you're agreeing to just take up the burden to show the

1    connection?

2              MR. GROSSMAN:  I'll take up the burden,

3    Judge, but I do think that there's nothing inappropriate

4    for the Court to ask who's in front of me and -- but

5    nonetheless, we will take up the burden to do that.  If we

6    can show it, we'll be happy to come back.

7              Again, we can do it the hard way, but I'm

8    really trying to cut through some procedural nonsense.

9              THE COURT:  Okay.  So --

10             MR. GROSSMAN:  There is one other piece,

11   Judge ---

12             THE COURT:  -- you've disclosed that there

13   is maybe a difference in the -- in the list of what you

14   called related parties and what I'm calling the targets of

15   the subpoenas, but you mentioned as to -- I think you said

16   15 of the 22 would ---

17             MR. GROSSMAN:  Yeah, I was just taking

18   opposing counsel's statement that he has apparently done

19   the math.

20             Here's the way I look at it, Judge.  There

21   are -- there is the Centennial entity that is the subject

22   of the veil piercing order.

23             THE COURT:  Okay.

24             MR. GROSSMAN:  There's the Mercato entity,

25   which is not actually before the Court.  There's

1    Mr. Batista, himself.

2              From our perspective, applying the

3    Petroforte and the Mappin rulings from this Court, we

4    think that the broad discovery should be justified as to

5    those three.

6              THE COURT:  Okay.  So we can take up limited

7    argument on whether the veil piercing order should be

8    given sufficient weight to treat those three entities

9    essentially as debtors for purposes of broad discovery.

10             It's not even Petroforte there, they're

11   actually -- although I guess Petroforte, we had

12   Securinvest was maybe named as one of the targets --

13             MR. GROSSMAN:  Right.

14             THE COURT:  -- of the subpoenas issued.

15             MR. GROSSMAN:  And I do want to add one more

16   request, though.

17             We think additionally, applying sort of the

18   Petroforte analogy, I'm not saying it's a perfect fit,

19   the actual parent company to the debtor is what I called

20   in the Petroforte case a sandwich company because it is

21   controlled, its ownership -- its ownership is Centennial

22   and Mercato.

23             Mercato and Centennial together control MMX,

24   the parent, what -- what -- what they call the S -- S.A.,

25   is the way they described it in their papers, but they are

1    57 percent controlling shareholders.

2                THE COURT:  Okay.  So by application

3    directly or by close analogy to the reasoning in

4    Petroforte, you would say that since Mercato and

5    Centennial -- Mercato and Centennial's assets are liable

6    for the debts of your debtor, that you're entitled to find

7    out -- have broad discovery to determine the value of the

8    parent, MMX --

9                MR. GROSSMAN:  Correct.

10               THE COURT:  -- as a -- as a related party or

11   target?

12               MR. GROSSMAN:  Correct.

13               THE COURT:  Okay, and so is there or are

14   there other entities besides MMX parent -- I'm just going

15   to call it MMX parent, since the debtor is also MMX.

16               Besides MMX parent, Centennial, Mercato, and

17   Eike Batista, are there any related parties that you

18   believe the record presently supports the discovery, or

19   for every -- all of the other related parties, you would

20   like to supplement the record?

21               MR. GROSSMAN:  That will be correct,

22   Your Honor.

23               Of course, the debtor, because the debtor is

24   actually -- we're actually asking these institutions for

25   the debtor's transactions, but I think that's a given.

1          THE COURT:  Okay.  So as to the debtor, MMX

2     parent, Centennial, Eike Batista and Mercato as targets,

3     if I apply Petroforte or adopt your argument, I'm not

4     ruling yet, you'd get broad discovery, and to the extent

5     they're raising any specific trade secret issues, you'd --

6     you'd want -- your argument, that they need to be more

7     specific on what particular documents they believe are

8     protected?

9          MR. GROSSMAN:  That would be true, Judge,

10    but I'm not adverse to the same thing we did I think in

11    Petroforte, which is if the documents come in, I have no

12    problem with the BastAmron firm, as counsel for those

13    entities, to get a first look at them, to make sure that

14    there's no secret sauce in the documents.

15          You don't usually share that with your bank,

16    but if that's the case, I have no problem with that.

17          THE COURT:  Okay.  All right.  So who's it

18    going to be, Mr. Amron or Mr. Laux?

19          MR. BAST:  Mr. Bast.

20          MR. LAUX:  Mr. Bast, Judge.

21          THE COURT:  I'm sorry, Mr. Bast.

22          MR. LAUX:  It will be me, though, Judge,

23    Zak Laux.

24          We -- we would agree to the proposal by

25    Mr. Grossman specifically to have the first look at any

1    documents that may be produced, and the general construct

2    that he described regarding taking care of arguments at

3    the front end, rather than coming back on a second

4    objection.

5                  I did want to mention ahead of both of those

6    concepts is that, number one, we don't concede, and I have

7    not seen any evidence, and it's the first time I've heard

8    that S.A., the parent company, as -- as we've been calling

9    it, is actually majority controlled by Centennial and the

10   Mercato entities.

11                  So as -- as far as S.A. has been included in

12   this grouping of entities that are entitled -- that the

13   trustee is entitled to broad discovery, we do not concede

14   that point.

15                  Secondly, Judge, I don't know, and perhaps

16   today we'll find out, how the pendency of that veil

17   piercing order, and the relevant appeals and motions for

18   clarification and opportunity for subsequent appeals

19   affects the Court's analysis.

20                  That order is not final and binding, as we

21   describe in the declaration attached to our reply to the

22   motion to quash, and the events leading up to it also

23   described in that declaration seem very questionable,

24   all -- always done under seal.  There are -- there are

25   several orders and whole proceedings to which the debtor

Page 20

1    and S.A. have not had access to in Brazil.

2                    So I -- I'm not sure that we can apply the

3    two cases the Court has mentioned in the same way they

4    were applied, when we do not have a veil piercing order

5    that is final and binding, and that brings in these three

6    entities, two entities and one individual, as liable for

7    the debts of the debtor.

8                    THE COURT:  All right.  There's really two

9    issues, one is -- let's break it down.  If it was --

10   putting aside the finality for a moment, if it was a final

11   order, do you have any argument that -- against

12   essentially treating them -- I say them, Centennial,

13   Batista and Mercato, in the same fashion as the Court

14   treated parties over whom the bankruptcy was formally

15   extended in Petroforte?

16                   MR. LAUX:  I have not seen evidence in this

17   matter that the veil piercing order, and making these

18   three individuals and entities liable for the debts of the

19   debtor, is the equivalent of bringing them into the

20   Brazilian bankruptcy proceeding.

21                   So to the extent that is the case, and the

22   trustee can show that that is what the Court intended by

23   the veil piercing order, and that is the effect under

24   Brazilian law, perhaps we would concede that, but I'm not

25   prepared to do that today on the record that we have.

1                    THE COURT:  Well, if -- if the -- well, is

2    there a fact issue as to whether the free -- the freeze --

3    I mean, the veil piercing order was attached, I didn't

4    read it, but as described by Mr. Grossman or Ms. Escobar

5    or whoever wrote the -- the brief, it provides that the

6    assets of these three entities are liable for the debts.

7                    MR. LAUX:  I agree, Judge.

8                    THE COURT:  You don't -- you don't dispute

9    that that's what it says; right?

10                   MR. LAUX:  That is what the veil piercing

11   order says.

12                   THE COURT:  Okay.  So if -- if their assets

13   are liable for the debts, why -- why shouldn't the foreign

14   representative, who is trying to marshal assets, try to

15   find assets that are owned or controlled by -- by these

16   parties just the same as if they were debtors?

17                   MR. LAUX:  The only response I have is that

18   it circles back to the lack of finality of that order.

19                   THE COURT:  All right.  I'm going to rule on

20   that point for -- it may not be the identical veil

21   piercing order, but in the Mappin case that I cited, and

22   the main case is Massa Falida de Mappin, the main case is

23   16-25541, but that I believe was a veil piercing order and

24   we went through the analysis, and I concluded that if a

25   party has been brought into a Brazilian proceeding through

1    veil piercing, it is equivalent, or at least equivalent in

2    my mind for purposes of discovery, to having the

3    proceeding extended to them.

4                I think we did get into particular aspects

5    of Brazilian law in more detail in Mappin, but I'm -- I'm

6    satisfied that that is the correct result, and it

7    certainly makes sense from a policy standpoint that if --

8    if Batista's assets are liable for the debts of the debtor

9    here, that the trustee ought to -- the foreign

10   representative ought to be able to find out what assets he

11   has, whether directly under his ownership or under the

12   ownership of companies he controls.

13               As to finality, I actually had that argument

14   in Petroforte as to -- let's see where it's described.  I

15   think what was still on appeal, and Mr. Grossman or

16   Ms. Escobar may remember, but there was -- there were the

17   entities, Securinvest and Rural Leasing that were the

18   beneficiaries of what was determined to be a fraudulent

19   transfer, and for that reason under Brazilian law they

20   were brought in as parties, the bankruptcy was extended to

21   those entities, or at least as to Securinvest and

22   Katia Rabello.

23               And the defendants said, okay, probably

24   oversimplifying or butchering the facts, but they said

25   we'll give back the plant, we'll undo the fraudulent

1    transfer, so everything is fine now, get us out of the

2    bankruptcy.  And I think initially one judge said yes,

3    another judge said no, that went up through a few levels

4    of appeal and there was still an appeal pending.

5              Is that fairly accurate?  Okay.  So in

6    Petroforte at Page -- this is 542 B.R. at 910, I said

7    because there is no stay pending appeal, the Court finds

8    no cause to abate or stay discovery pending the outcome of

9    the proposed settlement appeal, so it was a fairly short

10   description.

11             I also looked before I came in today, at the

12   case cited by the foreign representative, and I would cite

13   that further for there not being anything for purposes of

14   Chapter 15 and Chapter 15 discovery that would require a

15   final order, and that's In Re: -- I can't read my writing,

16   is it Genova or Gerova, does anybody remember?

17             UNIDENTIFIED SPEAKER:  I think it's Gerova,

18   but I'm not sure.

19             THE COURT:  I think it's Gerova,

20   G-e-r-o-v-a, Financial Group, Limited, 482 B.R. 86 at

21   Page 94, and in that -- I wrote down bankruptcy, I -- I'm

22   not going to cite the Court because I -- I wrote in my

23   notes Southern District of Florida, but I don't think it

24   was a Florida case, but maybe.

25             But in any event, in that case the actual

1    order, the winding up order, whatever it was under the

2    foreign law that was applicable, was on appeal, and

3    notwithstanding the fact that the -- in effect, the order

4    authorizing the foreign bankruptcy itself was on appeal,

5    the Court said the appeal of the order authorizing the

6    bankruptcy was not a basis to deny recognition under

7    Chapter 15.

8              So I -- I will say that if -- if, perhaps,

9    there had been no appeals at all yet of the veil piercing

10   and -- and you could demonstrate that it just seemed

11   outrageous under Brazilian law, I -- I, perhaps, would

12   revisit the -- the notion on just some equitable grounds

13   of requiring discovery, but I'm not going to get into the

14   strength or -- or weakness of your further appeal.

15             There's been what, two levels of appeal

16   already or just one?

17             MR. LAUX:  One level of appeal and a motion

18   for clarification before that same appellate court.

19             THE COURT:  Okay.  All right.  So I -- I

20   don't find that the pendency of the appeal, based on the

21   authorities just cited, is a -- is a basis for delay.

22             So that resolves, with the right for you to

23   assert specific objections after reviewing the documents,

24   on the basis of trade secret or other grounds, to either

25   withhold the documents or perhaps require some kind of

1    confidentiality agreement, but that would resolve Batista,

2    Centennial and Mercato as -- as targets.

3                    So I guess it's back to you, Mr. Grossman.

4    Is there something in the record to substantiate what you

5    proffered, that is that the parent, being described now as

6    MMX S.A., is owned and controlled by Mercato and

7    Centennial?

8                    That was where you started a few minutes --

9                    MR. GROSSMAN:  Yes, sir.

10                   THE COURT:  -- a few minutes ago, that there

11   was nothing in the record.

12                   MR. LAUX:  Judge, while Mr. Grossman

13   searches for that, could I -- I'd like to discuss one

14   overarching topic here that was described in our reply to

15   the motion to quash, specifically in the declaration

16   attached to it, and that is that the debtor's Brazilian

17   bankruptcy counsel, who's also S.A.'s Brazilian bankruptcy

18   counsel, states in that declaration that all unsecured

19   creditors have received what they're entitled to or have

20   elected to receive under the debtor's, this is

21   MMX Sudeste's, plan of reorganization.

22                   It seems to me, based on those statements in

23   that declaration to which there is no counter evidence,

24   that this is a case where there will be a surplus, and I'm

25   not sure that further discovery as to these veil piercing

1    entities who are liable for the debts of the debtor, is

2    really warranted if all creditors of the debtor have been

3    paid in full or have received already what they've elected

4    to under the debtor's plan.

5                 THE COURT:  The whole -- the history here

6    was a bit unusual to me in terms of separate investigative

7    proceedings after essentially a reorganization was

8    approved, but I guess, Mr. Grossman, if you can comment on

9    that as -- as well, or -- or you can perhaps call on the

10   foreign representative or his attorneys to respond.

11                There must be something more going on here

12   than a trustee seeking discovery and looking for assets

13   if -- if everyone has been paid, but ---

14                 MR. GROSSMAN:  Sure.

15                 THE COURT:  So, anyway, so let's turn the

16   podium back to Mr. Grossman on both the ownership of the

17   parent, MMX S.A., and a response on the issue of why is

18   this all happening.

19                 MR. GROSSMAN:  Thank you, Your Honor, for

20   allowing me to have a pit stop there with my -- with my

21   Brazilian colleagues.

22                They explained to me that the -- the -- on

23   this last point, that the plan that was voted on by the

24   creditors was a turnover of asset plan to the creditors,

25   but the asset actually hasn't been turned over.

1            During this period before the asset was

2  turned over is where the fraud was discovered, at least as

3  alleged by the foreign representative as judicial

4  administrator, and then went to the Court and said this

5  issue has arisen, I have found these incidences of

6  problems and could you please address it?

7            So from our perspective, we don't feel the

8  plan has been, to use an American phrase --

9            THE COURT:  Consummated.

10           MR. GROSSMAN:  -- consummated or I

11  wouldn't -- I wouldn't want to use -- because here it's

12  very easy to -- to have substantial consummation, you make

13  one pay -- you know, you make one payment, but the -- the

14  object of the plan, which was the turnover of the assets,

15  has not been completed.

16           I'm actually told there's going to be a

17  creditors' meeting in ---

18           UNIDENTIFIED SPEAKER:  November 7th -- 8th.

19           MR. GROSSMAN:  Next week, November 8th of

20  the correct creditors.

21           THE COURT:  So at least the proffer is that

22  this isn't just for the benefit of the representative and

23  his attorneys in Brazil and here, that there are creditors

24  that need to be paid if you --

25           MR. GROSSMAN:  Correct.

```
1                   THE COURT:  -- find more money?

2                   MR. GROSSMAN:  Correct.

3                   THE COURT:  I mean, I'm ---

4                   MR. GROSSMAN:  There's no -- there's no -- I

5    don't think there's any dispute that even the plan that

6    was voted on was not a hundred cent plan.

7                   When -- when counsel says it was a surplus

8    plan, he doesn't mean a surplus in the traditional sense,

9    that all the creditors from the turnover of the -- of the

10   asset was going to get a hundred cents on the dollar.  I

11   think what he was saying is they're going to get

12   everything that the plan provided for.

13                  That's not a surplus plan, that's a, you

14   agreed to a blankety-blank cents on the dollar plan, but

15   there's this -- this gap is what we're looking for, which

16   is why, Judge, if you go to the actual piercing the veil

17   order, it has a cap on the number, which is 792 million

18   reais.

19                  UNIDENTIFIED SPEAKER:  Almost 800.

20                  MR. GROSSMAN:  Almost 800 reais is the --

21   is -- so there's a cap on the viability.  So meaning if

22   these veil pierced defendants wanted to write a check,

23   they had the money, wrote the check, they could satisfy

24   their obligation by writing the check to the -- for the

25   differential.
```

Page 29

```
 1              So that's -- that's the story on whether

 2    it's a surplus.  Its not really a surplus.

 3              THE COURT:  Okay, and the other issue,

 4    ownership of S.A.

 5              MR. GROSSMAN:  I -- I, frankly, didn't think

 6    this was going to be a problem, but in the -- if you went

 7    to the veil piercing order, the Court is describing

 8    the ---

 9              THE COURT:  Do you have the docket entry?

10              MR. GROSSMAN:  Yeah, if you go to

11    Docket Entry 2, which was the actual verified petition,

12    and this particular order has been attached to multiple

13    pleadings, this would be 2-1, and then you have to go all

14    the way, Judge, to 29 of 50 is the beginning of the order.

15              THE COURT:  Okay.  I made it there.  So this

16    is the translation.

17              MR. GROSSMAN:  Correct.  The second page of

18    the translation, which would be Page 30 of 50, at the top

19    in the second full paragraph describes the controlling

20    shareholders of MMX Sudeste, which is the debtor, during

21    the relevant period, i.e., Mr. Batista, Centennial and

22    Mercato.

23              THE COURT:  Where did you get the 57

24    percent?

25              MR. GROSSMAN:  That I got from a chart, and
```

1    I'm not sure this chart is of record, Judge, so it's my

2    cheat sheet, so I'm not sure that I have that.

3                    I'm trying to find the reference, Judge, to

4    MMX, the parent.  I don't think there's any doubt that MMX

5    is the parent of MMX Sudeste.

6                    THE COURT:  Yeah, but this paragraph you

7    just cited deals with Sudeste, not S.A.; right?

8                    MR. GROSSMAN:  Yeah, yeah, I just realized

9    that.

10                   I apologize, Judge.  I really wasn't -- I

11   didn't think this was a -- a debate about how MMX, the

12   parent, who controls it.  I mean, it's a public company

13   traded in Brazil that's in its own reorganization, so I

14   didn't think the fact who -- who owns it directly or

15   indirectly is of much debate.

16                   But, you know what, I don't want to waste

17   the Court's time, if you want to push that one over and

18   we'll -- we'll give you the S -- the Brazilian equivalent

19   of the SEC filings, we'll do that, too.

20                   THE COURT:  Okay, or you can -- if you think

21   it's in the record, you can, I suppose, just seek

22   reconsideration and get that piece of it done sooner.

23                   By the way, what kind of deadline were you

24   going to request on supplementing the record?

25                   MR. GROSSMAN:  I think 60 days.  I don't

1    know where that would put us because that -- that means we

2    will have gone through everything that we have and if

3    there's something we need to get an order from another

4    court to un -- unseal or get permission to use, that

5    should give us sufficient time.  Because if we wait -- if

6    we do 90 days, it won't -- it will be irrelevant because

7    of the Christmas Holiday, they have both Christmas week

8    and the following week --

9                    THE COURT:  So the --

10                   MR. GROSSMAN:  -- the country shuts down.

11                   THE COURT:  -- the subpoenaed parties would

12   be directed to withhold any production as to those

13   additional entities pending further court order?

14                   MR. GROSSMAN:  I'm okay, Judge, either way,

15   we can do that.  I'm okay with issuing brand new subpoenas

16   that comply with this Court's ruling today, nice clean

17   separate subpoenas.  They can get started on those, and

18   then we come back before Your Honor -- almost like I was

19   asking a motion for a 2004, telling you why I wanted it.

20   I think that may be cleanest for them --

21                   THE COURT:  All right.  Then I'll ---

22                   MR. GROSSMAN:  -- because they're

23   institutions.

24                   THE COURT:  So I'm -- I'm having trouble

25   maybe remembering the specifics that you started with, but

1   it sounded a little different.

2              I thought you didn't -- what you just said

3   now sounds like we grant the motion to quash and -- well,

4   I -- let me not -- let me not stutter through it.

5              MR. GROSSMAN:  Here's the thought, Judge.

6              THE COURT:  What -- what -- what order would

7   you like me to enter today?

8              MR. GROSSMAN:  I think, Your Honor, if

9   Your Honor entered an order on the motion to quash

10  denying -- granting the motion in part or denying the

11  motion in part and deferring it in part, and in the

12  section that denies it in part, you direct us to recast

13  the subpoenas to comply with this order, with the order

14  today, and that with respect to the rest of it that is

15  deferred, that we come before the Court with a proposed

16  form of subpoena and the backup documentation at the

17  hearing that's scheduled in the order.

18             THE COURT:  But as to the -- as to the three

19  veil piercing entities, Batista, Centennial and Mercato, I

20  was -- thought if I'm denying the motion to quash, I'm

21  authorizing broad discovery.

22             So when you say you're going to reissue the

23  subpoenas, you mean reissue at this point limited to those

24  three?

25             MR. GROSSMAN:  Correct, take off all the

1   other names so that ---

2                   THE COURT:  And then if you --

3                   MR. GROSSMAN:  Correct.

4                   THE COURT:  -- if you -- if you want --

5   don't want to wait 60 days, if there's something readily

6   available, I guess you could seek rehearing as to MM -- as

7   to MMX S.A.

8                   MR. GROSSMAN:  Okay.  All I'm trying to

9   avoid, Judge, is the fact that we issued a subpoena to say

10  The Clearing House, it has nine -- however many names on

11  it, and by virtue of the rule it's only going to have four

12  names on it, let's say, or three names on it.

13                  I don't want to get -- I think it would be

14  confusing to the subpoenaed target of what they're

15  supposed to do, and rather than have them produce

16  something that they -- that they're not supposed to

17  produce, giving them a nice clean one, I think will -- in

18  the subpoena can be something, but that way we don't run

19  any risk of contamination.

20                  THE COURT:  But what's the point of

21  reserving ruling, as opposed to just granting the motion

22  and then you do your due diligence for 60 days, and when

23  you determine what you've got, you reissue subpoenas

24  consistent with Petroforte either seeking broad discovery

25  for entities that you believe you can show are owned or

Page 34

1    controlled by the debtor or any of the -- the three veil

2    piercing entities, or narrower subpoenas to the others?

3    Although, I guess you still need to make some showing.

4              I mean, it takes us back to where you

5    started.  You want to -- you want to kind of make your

6    showing first ---

7              MR. GROSSMAN:  I don't want to waste

8    anybody's time.  I mean, if Mr. Bast -- if you -- if you

9    left it to us, we will find a way to make that language

10   work.

11             THE COURT:  Yeah, I think we can work --

12   work that out.

13             I'm just -- I'm just looking at it more from

14   the standpoint that you were also addressing, to make it

15   simpler for the subpoenaed parties.  So if we're reserving

16   on the motion to quash, but it would be with an order that

17   pending further order they -- they need not produce any

18   documents with respect to any of those parties.

19             MR. GROSSMAN:  That would be fine.

20             THE COURT:  Okay.  All right.  So let's --

21   let's review and see if there's any further argument.

22             So the proposed order that I'll let

23   Mr. Grossman take a crack at would ---

24             MR. GROSSMAN:  You -- you know when you say

25   that, that doesn't mean me because I'm not actually doing

1    any of this, you know that.

2                THE COURT:  Right.  Well, I'll -- I'll

3    assume your -- your firm, I don't mean to give you all the

4    credit for -- I'll give you the credit for not having the

5    sufficient record, and give the others the credit for

6    where the record is sufficient, how's that?

7                MR. GROSSMAN:  Well deserved, Judge.

8                THE COURT:  All right.  So here's where I

9    think we -- where we're at, and I'll take further comment.

10   So a simple order denying the motion to dismiss, you can

11   put in, for whatever purpose it serves, it's not going to

12   have any more analysis than the lack of analysis on the

13   record, but that I reject the holding in -- in Drawbridge,

14   and alternatively -- put in the alternatives, 109 doesn't

15   apply, rejecting that holding, or alternatively the

16   deposit would satisfy 109, if -- if applicable.

17               Then on the motion to quash, at this point

18   it would be denied as to Batista, Centennial and Mercato,

19   and broad discovery be allowed provided, however, the

20   documents will be submitted to BastAmron in -- I don't

21   remember in Petroforte the mechanics of it at the end.

22   How many days you need, what, two weeks, maybe to just

23   review and file a motion for protective order or

24   alternatively turn them over?

25               MR. LAUX:  That would be fine, Judge.

1              THE COURT:  We -- we had a seven or eight

2    paragraph sequence in Petroforte, which I think can be

3    used for guidance, and it will be the Court will reserve

4    ruling, but pending further order the subpoenaed parties

5    need not produce documents for, and then I guess list all

6    of the other entities, including at this point MMX S.A.,

7    and then I guess you'll -- you'll seek rehearing.

8              All right.  So comments or clarification or

9    you think we're good?

10             MR. LAUX:  Just one clarification, Judge.

11   Mr. Grossman mentioned that he had already received

12   responses from some of these subpoenaed targets.  So I

13   just wanted to clarify, if that were the case, and make

14   sure that those documents, to the extent they don't relate

15   to the three -- well, even if they do relate to the three

16   veil piercing targets, we have an opportunity to review

17   those documents, as well.

18             MR. GROSSMAN:  Judge, we received a

19   response, production, received the documents, sent them

20   onto Brazil before the motion to quash was filed.  They

21   were from the actual Centennial entity in the order;

22   correct?

23             MS. ESCOBAR:  The registered agent.

24             MR. GROSSMAN:  The registered agent of the

25   Centennial entity that you -- we've been talking about,

Page 37

```
 1    the veil pierced enjoined entity, and we have no problem,
 2    of course, handing it -- giving their counsel copies
 3    of what we -- what we have.
 4                THE COURT:  Okay.  I -- I'm not going to
 5    predict whether there would be or not be any basis to seek
 6    relief as to -- to those, but I guess you'll give them
 7    copies anyway, so they'll have the same right to not deny
 8    turnover, but at least to, I guess -- I don't know what
 9    the remedy is if they're already out, but you can -- let's
10    not worry about that until you see if there's anything
11    objectionable.
12                Okay.  So I think we're there.  If you can't
13    reach agreement, just send me to my direct e-mail, not to
14    RAM Chambers, one version and a red-line version from the
15    other side if -- if need be.
16                So I don't know if your firm, because you do
17    a lot of Brazilian work, or any of the folks from Brazil
18    that are here, are familiar with the -- the VASP
19    bankruptcy, because I was -- that was the case yesterday,
20    and I was surprised to see that in looking at
21    Judge Costa's lengthy freeze order in that case, where he
22    froze the assets of several entities, that he denied a
23    freeze as to two entities that were familiar to me, that
24    apparently have purchased assets of VASP, Securinvest and
25    Rural Leasing, S.A., and I was just curious, and this has
```

1   nothing to do with the motion for protective order here,

2   but when -- when was Petroforte extended to Securinvest,

3   was it before 2013, do you remember?

4              UNIDENTIFIED SPEAKER:  2007, 2007.

5              MS. ESCOBAR:  2007, Your Honor.

6              THE COURT:  2007.  So if all the assets of

7   Securinvest were subject to Petroforte, I don't even know

8   how there could have been some attempt to freeze assets

9   for purposes of this other case, but I won't lose sleep or

10  try to figure that out, it just was an interesting

11  connection, and I -- and I don't want a response to the --

12  from the Brazilian attorneys and representative who may

13  know more detail because perhaps it's -- it's yet to be

14  something that comes up in the VASP 13 -- 15, I mean.

15             MR. GROSSMAN:  Judge, you're -- you're

16  proving why the third section of the venue clause should

17  always be the Southern District of Florida, because every

18  Brazilian case between the three of you here in the

19  Miami Division, you know all -- you have all the

20  bankruptcies.

21             THE COURT:  Well, I'm -- I'd like at some

22  point maybe to have more -- go to some more specific

23  seminar.

24             I know years -- several years ago at the

25  Caribbean Conference before I had any of these cases, I

1    think Christopher Jarvinen did a presentation of the new

2    Brazilian insolvency law, but the law as it applies in

3    extending the bankruptcy, veil piercing, the separate

4    sealed investigative proceedings, public proceedings, I

5    mean, I'm starting to understand I think enough of it to

6    analyze the discovery issues, but ---

7                    MR. GROSSMAN:  Does that mean you're

8    volunteering for the rubber chicken dinner circuit for --

9    for the ---

10                   THE COURT:  No, no, I'm not saying I could

11   explain it, I just ---

12                   MR. GROSSMAN:  Oh, no, no, you would explain

13   the U.S., but you would be there watching the other

14   panelists tell you about all those things.

15                   THE COURT:  Well, we'll -- we'll see.

16                   Okay.  So I think we've got it.  One order

17   on the motion to dismiss; one order granting in part and

18   reserving ruling in part on the motion to quash, and I

19   guess you'll just say as to the entities against whom the

20   motion to quash is -- or with respect to whom the motion

21   to quash is denied, that you'll be reissuing subpoenas

22   limited to the --

23                   MR. GROSSMAN:  Very good, Your Honor.

24                   THE COURT:  -- to those three, what I'm

25   calling targets or -- or four if you put on the proof.

Page 40

1                     I guess you can try to show -- maybe you can

2     handle it -- if -- if you can find something in the next

3     few days before -- before you submit the order, maybe you

4     could either prove, and then include S.A. as -- as one of

5     the entities that the motion to quash would be denied,

6     or -- or just put that off for the 60 days, if you can't,

7     but --

8                     MR. GROSSMAN:  Understood, Your Honor.

9                     THE COURT:  -- either way.  If you have --

10    if you have to file a separate motion for rehearing on the

11    parent, then provide that information, we can look at it.

12                    MR. GROSSMAN:  Very good.

13                    THE COURT:  Okay.  Thanks.

14                    MR. GROSSMAN:  Thank you for your time,

15    Judge.

16                    MR. LAUX:  Thank you, Judge.

17                    (Thereupon, the hearing was concluded.)

18

19

20

21

22

23

24

25

Page 41

**CERTIFICATION**

STATE OF FLORIDA          :

COUNTY OF MIAMI-DADE   :

          I, Margaret Franzen, Court Reporter and
Notary Public in and for the State of Florida at Large, do
hereby certify that the foregoing proceedings were
transcribed by me from a digital recording held on the
date and from the place as stated in the caption hereto on
Page 1 to the best of my ability.

          WITNESS my hand this 1st day of December.

_____

MARGARET FRANZEN

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #FF100898
April 14, 2018